UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

- - -

UNITED STATES OF AMERICA,          .   Case No. 5:18-CR-0067
                                   .
          Plaintiff,               .
                                   .   Lexington, Kentucky
     - v -                         .
                                   .   Thursday, February 14, 2019
BRADLEY A. WHITE,                  .   9:04 a.m.
                                   .
          Defendant.               .
                                 - - -

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE KAREN K. CALDWELL
UNITED STATES DISTRICT COURT JUDGE

- - -

For the United States:     ROGER WEST, ESQ.
                           Assistant U.S. Attorney
                           United States Attorney's Office
                           260 West Vine Street, Suite 300
                           Lexington, Kentucky  40507

For the Defendant:         WHITNEY TRUE LAWSON, ESQ.
                           True, Guarnieri Ayer, LLP
                           124 West Clinton Street
                           Frankfort, Kentucky  40601

Court Reporter:            LINDA S. MULLEN, RDR, CRR
                           Official Court Reporter
                           101 Barr Street
                           Lexington, Kentucky  40507

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1          (Proceedings in open court, February 14, 2019, 9:04 a.m.)

2      THE COURT:  Good morning.

3      ALL:  Good morning.

4      THE COURT:  Would the clerk please call the first matter

5  to come before the Court.

6      THE CLERK:  Yes, Your Honor.  Lexington Criminal Action

7  Number 18-67.  United States of America versus Bradley A.

8  White, called for sentencing.

9      THE COURT:  Would the United States make its appearance

10  for the record?

11      MR. WEST:  Yes, Your Honor.  Good morning.  Roger West on

12  behalf of the United States.

13      THE COURT:  Mr. West.

14      For the de.

15      MS. LAWSON:  Your Honor, Whitney Lawson on behalf of

16  Mr. White, who is seated to my right.

17      THE COURT:  Ms. Lawson, Mr. White.

18      This matter is called on for a sentencing hearing.  Has

19  the United States received all of the relevant materials

20  regarding this case, including the presentence report and any

21  adjustments made pursuant to the First Step Act?

22      MR. WEST:  Yes, Your Honor, I have.  Pursuant to that, the

23  United States filed a notice of withdrawal of the 851

24  enhancement yesterday, so he is no longer subject to the 851

25  enhancement.

1      THE COURT:  Thank you very much, Mr. West.

2      Ms. Lawson, have you and Mr. White received all of the

3  sentencing materials?

4      MS. LAWSON:  Your Honor, we have.  And I have provided a

5  copy of that sentencing material and any addendums to

6  Mr. White.  I have reviewed those and we're in agreement with

7  the addendum as it's been provided, Your Honor.

8      THE COURT:  All right.  Thank you very much.

9      The Court will note that the First Step Act has been

10  applied, reducing the defendant's sentencing range from 262 to

11  327 months to 188 to 235.

12      But there are other objections that have been raised by

13  the defendant; is that correct, Ms. Lawson?

14      MS. LAWSON:  That is correct, Your Honor.

15      THE COURT:  Very well.  The first, I believe, is Objection

16  Number 1.  You object to the facts as contained in the

17  presentence report.  But I really believe that that relates to

18  the leadership role and the career offender status.

19      MS. LAWSON:  That's exactly correct, Your Honor.

20      THE COURT:  Very well.  I will hear from you at this time

21  then regarding those two objections.  I have read your

22  submissions.

23      MS. LAWSON:  Your Honor, we do intend -- I've never

24  handled a full-on sentencing before you.  We do intend to call

25  a few witnesses, one of which is in regards to those

1   objections.  Would you like to hear my arguments in regards to

2   the objections prior to the testimony?

3       THE COURT:  If you just want to kind of give me an

4   outline, I have read your objections.  But if there's anything

5   you would like to highlight for me to listen, help me frame the

6   evidence.

7       MS. LAWSON:  Sure.  Your Honor, our objection is mainly

8   based on the facts in reviewing the evidence, it seems

9   Mr. White's involvement in this is more of that of a

10  facilitator than a leader.

11      There's been a number of controlled buys that have been

12  taped by the investigative entities in this case, all of which

13  show Byron White bringing the narcotics, accepting the money.

14  To my knowledge, there was never any tracking of that money

15  that was received by Mr. White to see how much -- Byron White,

16  I should use their full names in this because they are both

17  Mr. Whites.  There was never any tracking of the money received

18  by Byron White or Bradley White in this to see who retained the

19  majority of the money that was received.

20      In fact, based on the evidence that we have, all money

21  that was given to the confidential informant in this was

22  retained by Byron White.  This is not an issue where we have

23  concerns of any mistake in who it was that was, in fact,

24  receiving that money.  The government is not going to be able

25  to deny that Bradley White was wheelchair bound at the time

1    that all of these allegations were made.

2        The individual doing these controlled buys was clearly

3    walking to the car, entering the car, sitting down.  So there

4    is no doubt that it is Byron White that is doing that.  So we

5    do not believe that they can prove, meet the burden and show

6    that he was, in fact, a leader, but instead that Bradley White

7    was more of a facilitator in this circumstance.

8        THE COURT:  All right.  That's helpful.

9        I believe the United States has the burden on this.

10   Mr. West?

11       MR. WEST:  Yes, Your Honor.  I have one witness to present

12   to the Court regarding the facts, and that will address both

13   the -- it's not just a leadership role, it's a managerial or

14   supervisory role in addition to just being leadership, that's

15   why minor role doesn't apply.

16       With the permission of the Court, I'll put the witness on

17   and then I'll some make comments at the discretion of the

18   Court.

19       THE COURT:  You may.

20       MR. WEST:  Detective Hector Alcala, please.

21   **HECTOR ALCALA PASCUALLI, GOVERNMENT WITNESS, SWORN**

22       THE COURT:  You may.

23       MR. WEST:  Yes, Your Honor.  Thank you.

24                   HECTOR ALCALA PASCUALLI

25                     DIRECT EXAMINATION

1  BY MR. WEST:

2  Q.    Would you state you name and your occupation, please, sir.

3  A.    Sure.  My name is Detective Hector Francisco Alcala,

4  A-l-c-a-l-a, Pascualli, P-a-s-c-u-a-l-l-i.  I'm a detective for

5  the drug enforcement for Kentucky State Police.

6  Q.    How long have you been with the Kentucky State Police?

7  A.    13 years.

8  Q.    How long with the drug enforcement section?

9  A.    Nine years.

10  Q.    Were you one of the investigating officers in this case

11  against Bradley White and Byron White?

12  A.    Yes, I was.

13  Q.    Do you recall how the name Bradley White came to the

14  attention of the Kentucky State Police?  I guess you were

15  working with the FBI also, correct?

16  A.    Correct, at that time.

17  Q.    How did it come to the attention of the KSP and FBI?

18  A.    Sure.  There was a different investigation involving

19  Dairion Morgan, Mr. Morgan, who brought to our attention a

20  person who could be a confidential witness to make a

21  controlled -- to further the investigation into the heroin

22  coming into Lexington, Kentucky.

23      So they provided us with that person.  We met that person

24  in October of 2017.  And during the meeting, the discussions,

25  the only name that the person provided was Mr. Bradley White, a

1   person who was living in Louisville and who was handicapped.

2   Q.   Okay.  With that information, what did you all do in the

3   next step of your investigation, please, sir?

4   A.   Sure.  So once we obtained the name, of course we have an

5   intel analyst, provided the name to that and was able to

6   identify Mr. Bradley White through social media.  So from that

7   point, we obtained a phone number, and we instructed the

8   confidential witness to go ahead and start making contact via

9   text and was able to make a controlled purchase.

10  Q.   Okay.  At any time in these initial discussions or initial

11  planning, the name Byron White, did that come up at all, sir?

12  A.   No, sir.

13  Q.   Tell us about the first transaction that took place listed

14  on the indictment as Count 2, November 16th, 2017, please.

15  A.   Correct.  So the initial purchase was, you know, a couple

16  of days to -- there was some conversation and text messages

17  that we provided.  And there was, you know, trying to figure

18  out which day and time and where.

19       On this purchase, Mr. Bradley White, he instructed the

20  confidential informant on what time to be there and where to

21  meet.  He picked the location basically and what time to be

22  there.   And he negotiated a price for the, you know, product,

23  for the heroin.  And everything was done through him.  So we

24  followed those instructions.

25  Q.   Okay.  In the text messages, Mr. Bradley White set the

1   location for the transaction?

2   A.   Correct.

3   Q.   At that location, did you have KSP or FBI personnel in a

4   position to conduct surveillance to observe what took place?

5   A.   Yes, sir.  I was there and Special Agent Van Alstyne.

6   Q.   Tell us what happened, please.

7   A.   So we went to that location as instructed by Mr. Bradley

8   White, the confidential witness parked at that public parking

9   lot.  And there was more conversation as to, you know, we're

10  here, and those are in the text messages.  We're here, you

11  know, we're waiting.

12       There was a response, I believe, we're two to three

13  minutes out.  I'll be coming in in a Toyota vehicle.  So

14  Special Agent Van Alstyne was able to obtain that license plate

15  of that car, and I was able to see the person walking to the

16  vehicle, you know, and walk out of the vehicle.

17  Q.   Prior to that moment of you observing this person get out

18  of the vehicle, was there any indication that another person

19  would be involved?

20  A.   No, sir.

21  Q.   At any time prior to your observing that individual, were

22  there any communications with anyone else, other than Bradley

23  White?

24  A.   Other than those text messages, no.

25  Q.   Tell us what happened, please, sir.

1    A.   So when the vehicle left, Special Agent Van Alstyne was

2    able to obtain the license plate of that vehicle when they

3    left.  And of course the normal routine, we meet with the

4    confidential witness who relinquished the evidence.

5         Whenever we took it to the office later that evening,

6    later that day, we waited and we noticed that it was five grams

7    short of what we had ordered.  So we instructed our

8    confidential witness to complain about it via text.

9    Q.   To?

10   A.   To Bradley White, the person who she had been contacting

11   with.  There was several text messages that we provided copies

12   of.  Mr. White, you know, I guess saying that he was sorry, you

13   know, about the weight.  And there was something that -- in

14   effect on the text messages that it was confusion between him

15   and the other person, who at that time we did not know who it

16   was, and he will make it right.

17        He, on the text messages, asked if the person wanted to

18   meet that evening or the next morning, and we instructed the

19   witness to say we'll do it next time.

20   Q.   Okay.  Now, there's two other transactions involved on the

21   indictment, sir, listing --

22   A.   Three other, I think.

23   Q.   I'm sorry, three other.  December 5, 2017, December 22,

24   and January 17th, 2018?

25   A.   Yes, sir.  Right.

1   Q.   For the sake of efficiency, as to all three of these

2   remaining transactions, was there any communication between the

3   cooperating witness and Bradley White?

4   A.   Bradley White?

5   Q.   Yes, sir.

6   A.   All the communications was through him via text or phone

7   calls.

8   Q.   In all those other three transactions, who set the

9   location for where the transaction would take place?

10  A.   Mr. Bradley White.

11  Q.   And who set the price?

12  A.   Mr. White.

13  Q.   And who set the amount for the transaction?

14  A.   What do you mean, "the amount"?

15  Q.   Purchase amount, purchase quantity, how much money.

16  A.   Okay.  We ordered -- you know, can you do an ounce or like

17  that.  And Mr. White would respond yes.  So the amount we

18  controlled, but they controlled the price and locations.

19  Q.   All right.  Now, at some point did you identify the

20  codefendant, Byron White?

21  A.   Yes, sir.

22  Q.   Do you recall how you guys did that, please?

23  A.   Sure.  So like I testified, Special Agent Van Alstyne

24  obtained the license plate of that Toyota Camry.  We ran that

25  plate and came back to an address in Lexington, Kentucky.

1      So our intel analyst, I asked her to look and see how many

2    people and who's using this address on their driver's license.

3    So she was able to pull out all the people that used this

4    address on their driver's license.  And with the video, still

5    photo of the video that we provided and the driver's license, I

6    was able to match Mr. Byron White as that person.

7         MR. WEST:  Your Honor, I believe that's all of this

8    witness at this time, please.

9         THE COURT:  All right.  Would you like to cross-examine

10   the witness, Ms. Lawson?

11        MS. LAWSON:  Please, Your Honor.

12                         CROSS-EXAMINATION

13   BY MS. LAWSON:

14   Q.   How are you?  I'm Whitney Lawson.  We've met before,

15   though, haven't we?

16   A.   Yes, ma'am.  I'm doing well, thank you.

17   Q.   Based on your direct testimony, you will agree with me

18   that Bradley White was, in fact, wheelchair bound during all

19   the conduct you just testified to; is that correct?

20   A.   Yes, ma'am.

21   Q.   And you will agree that any of the controlled buys that

22   were done, were done by an individual that was walking to the

23   car, entering the car; is that correct?

24   A.   I will agree to the person who brought the narcotics, yes.

25   Q.   Okay.  And that person was Byron White; is that correct?

1   A.   Yes, ma'am.

2   Q.   So each of these controlled buys that were set up and

3   where surveillance was done, the narcotics were brought by

4   Byron White; is that correct?

5   A.   Yes, ma'am.

6   Q.   The money was collected by Byron White; is that correct?

7   A.   Yes, ma'am.

8   Q.   There was no actions done after the fact in regard to that

9   money that was collected by Byron White; is that correct?

10  A.   No, ma'am.  We did not -- were not able to follow the

11  cash.

12  Q.   So the money was not marked or anything like that.  You

13  would not have been able to figure out who retained what, if

14  any, was handed off to anyone else; is that correct?

15  A.   The money is always prerecorded by policy.  We always take

16  pictures of the serial number.  But we were never, you know,

17  able to trace that cash.

18  Q.   Okay.  So you didn't take any efforts to trace that cash

19  after the money was, in fact, handed to Byron White; is that

20  correct?

21  A.   I didn't find an opportunity to do so, no, ma'am.

22  Q.   Okay.  And you testified to looking at text messages

23  between Bradley White and your confidential informant, correct?

24  A.   Correct.

25  Q.   Are those the only text messages that were ever reviewed

1   by you?

2   A.    Right.   Everything that we have given you, everything that

3   we provided, that is all the text messages.   And some of the

4   conversations that Mr. Bradley White had with the confidential

5   informant during the recording, you can -- on the audio

6   recording, you can barely hear some of them, but you can hear

7   that and the confidential informant on the debriefing, you

8   know, she was able to identify as the person on the phone not

9   being the person who is, you know, delivering it.

10  Q.    Okay.   So you never looked at any additional text

11  messages, say, between Byron White and Bradley White; is that

12  right?

13  A.    Byron and Bradley?

14  Q.    Uh-huh.

15  A.    No, ma'am.

16  Q.    So the entirety of their roles in regards to these

17  actions, that was described to you by Byron White; is that

18  correct?

19  A.    I don't understand your question.   I'm sorry.

20  Q.    So -- okay.   Let me back up.

21        Byron White has cooperated, correct, in giving a

22  statement; is that right?

23  A.    We've talked to him.

24  Q.    Okay.   So in regards in your understanding as to how Byron

25  White and Bradley White functioned in their roles in this

1   trafficking, that was described to you by Byron White solely;

2   is that correct?

3   A.    So if you're asking me my knowledge of how Mr. Byron White

4   and Bradley White communicated or integrated on their -- on the

5   narcotics?

6   Q.    Uh-huh.

7   A.    My knowledge, are you asking me my knowledge of it?  Okay.

8   So my knowledge of it would be what I learned from Mr. Byron

9   White.  And my knowledge is that Byron described that every

10  single time the narcotics came from Bradley.  Every single

11  time.  And the money, he will give it to a female who Bradley

12  knew or something.  That female will give the money to, I

13  assume, to Bradley.  But he described that every single time

14  the narcotics came from him.

15  Q.    Okay.  So he describes this, though you'll agree that the

16  evidence only shows Byron White ever having possession of the

17  narcotics, right?

18  A.    Right, the video.

19  Q.    And you'll agree that the evidence only shows that Byron

20  White was ever in receipt of any money; is that correct?

21  A.    Pardon me?

22  Q.    The only evidence that we have is Byron White was the only

23  individual that received money as a result of these controlled

24  buys?

25  A.    Our confidential witness handed the cash to Byron White,

1  yes, ma'am.

2  Q.   Okay.  And we've not reviewed any text messages whatsoever

3  that might allude to the fact that in fact Byron was the one

4  that could possibly be setting these prices and that Bradley

5  White is simply the messenger of what Byron White is stating,

6  correct?

7  A.   Never heard of that, ma'am.

8  Q.   Okay.  But you didn't take steps to look at text messages

9  between the two to see if that was in fact the case, right?

10  A.   We never had the opportunity to have probable cause to get

11  a search warrant on Byron White's phone.  So you know, how can

12  I get that?

13  Q.   Okay.  You didn't attempt to do a search warrant for Byron

14  White's phone, did you?

15  A.   We done a trash pull at his residence and we obtained a

16  phone bill, you know.  And we don't subpoena for a toll.  But

17  nothing -- we didn't have probable cause, I believe, to be able

18  to do that, ma'am.

19  Q.   Okay.  So simply to summarize, your determination that

20  Bradley White was, in fact, setting the prices with all of this

21  is simply based on text messages exchanged between Bradley

22  White and the confidential informant, correct?

23  A.   That is correct.

24  Q.   Paired with the statement made by the cooperating

25  codefendant, correct?

1    A.    Yes, ma'am.

2          MS. LAWSON:  That's all the questions I have, Your Honor.

3          THE COURT:  Thank you.

4          Any redirect?

5          MR. WEST:  Just one.

6                      REDIRECT EXAMINATION

7    BY MR. WEST:

8    Q.    Detective, just want to make sure I understand.  In your

9    conversation with Byron White, he said Bradley gave him the

10   drugs that he distributed?

11   A.    Correct.

12         MR. WEST:  No other questions.

13         No other witnesses on behalf of the United States, Your

14   Honor.

15         THE COURT:  Thank you.  You may step down.

16         THE WITNESS:  Thank you, ma'am.

17         THE COURT:  Ms. Lawson, do you have any witnesses you

18   would like to call?

19         MS. LAWSON:  Your Honor, I do have two very short

20   witnesses --

21         THE COURT:  You may.

22         MS. LAWSON:  -- on behalf of the defendant.

23         First, I will call Donyale Beamon.

24         THE COURT:  The witness may approach.

25         **DONYALE BEAMON, DEFENSE WITNESS, SWORN**

1      THE COURT:  Please be seated up on the witness stand.

2                         DONYALE BEAMON

3                       DIRECT EXAMINATION

4    BY MS. LAWSON:

5    Q.   Ms. Beamon, can you please state your name for the record?

6    A.   Donyale White Beamon.

7    Q.   And do you know the defendant?

8    A.   I do.  Very well.

9    Q.   How do you know Mr. White?

10   A.   He is my cousin.

11   Q.   Okay.  So it's safe to say you've known him for a very

12   long time; is that right?

13   A.   Exactly.

14   Q.   Okay.  Can you just describe Bradley?  And, most

15   specifically, what Bradley has recently gone through in regards

16   to the gunshot wound that he has suffered from.

17   A.    It's been a very hard battle.  When Bradley was shot, we

18   went through a lot of depression, medical issues, I was trying

19   to be there for him.  And we spent a lot of time, to paraphrase

20   it, to talk him off the ledge.  Because being a young man who

21   was able to take care of hisself and do things, and you become

22   in the condition where you're dependent on somebody for

23   everything, it's not only your well-being, but for your kids

24   and everything.  It was -- it was a hard time.  It was very

25   hard, the way it happened and everything that followed after

1    that.

2    Q.   So can you clarify for the Court, this occurred in May of

3    2017; is that correct?

4    A.   Yes, ma'am.  Correct.

5    Q.   Can you tell the circumstances as to how Mr. White -- the

6    circumstances that resulted in his current health issues?

7    A.   Bradley was out with some friends and an incident took

8    place.  And there was some gentleman shooting at somebody that

9    he was with and he ended up paralyzed.  He lost two friends

10   that night.  Regardless of how people may look at them, they

11   were still humans, they were his friends.  And he had to accept

12   the fact that two individuals he was with were killed, yet he

13   made it but he was paralyzed.

14        In the midst of that, all we kept hearing was that it

15   wasn't meant for him, he just happened to be with the wrong

16   people at the wrong time.  Those are just words.  They can't

17   give him back what he had before it happened.

18        So you're out having fun, what they consider fun, and in

19   the midst of a blink of an eye, two gentlemen lose their life

20   and we get the call that he's in the hospital.  And we don't

21   know where he's going to be and he has not walked since that

22   day.  So it's been tragedy after tragedy.

23   Q.   So how long was Mr. White in the hospital after the

24   incident?

25   A.   As far as in the hospital here, I want to say maybe three

1  to four weeks.  And then he went to rehab in Louisville.  So --

2  and that was about maybe a couple of months itself.

3       So in the hospital, less than -- I don't want to say the

4  wrong number, but it was a lengthy time because we did a lot of

5  coming back and forth.  His mom actually stayed here a lot.

6  And then when he went to rehab, he was there for a length of

7  time before he came home.

8  Q.   How was it that Bradley's life changed after this incident

9  outside of the obvious?  But can you give the Court an idea of

10 day-to-day what it was like for him and your family after the

11 incident?

12 A.   We took turns.  My aunt works, so she would leave the door

13 open when she went to work for either one of the other sisters

14 or one of his siblings or another family member to go over

15 because -- to help him to the bathroom.  To go sit to make sure

16 he ate.  Doctors' appointments.  After doctors' appointments,

17 therapy sessions.  After therapy sessions, cleaning up where he

18 would mess on hisself.  Going over to have to make sure he was

19 clean.

20      It was -- medically, it was a lot.  It is a lot.  You're

21 going to the doctors.  You're trying to make sure he has what

22 he needs.  You're trying to keep his spirits up.

23      You know, I worked and I spent many hours on the phone

24 with Bradley in depression of, you know, "Donyale, I can't even

25 buy myself a hamburger."  So we would deal with that.  Then it

1   would be, "I have a doctor's appointment," and he would get

2   upset because the doctor's appointment could last for two hours

3   and he always felt like a burden.  But it's what had to be

4   done.  It wasn't something that could not be done.

5       Or buying supplies, things that he needed.  Just trying to

6   accommodate what he needed so that he could do whatever he

7   could for hisself to make him feel like a man.  You know, it

8   took a lot.

9       It took his manhood away.  And as a father, as a cousin,

10  as a son, as a brother, I do not sit here to say that Bradley

11  was a choirboy.  But I will say he was a man.  And that

12  shooting changed his life and the way he thought and the way he

13  did things.  And you know, as family, we did everything we

14  could to support and be there.

15  Q.   Immediately prior to this immediate matter, did you start

16  to see a change in Bradley at some point?

17  A.   I did.  I am a mother of a 22-year-old.  And anytime I had

18  a problem with my son, I could call Bradley and he was there.

19  And I never felt like he would lead him the wrong way, even in

20  the midst, he and I could talk about anything.  We go to

21  church.  I had got him to start going to church.

22      His kids -- great relationship with his kids.  He started

23  to go out -- after the shooting, he started to go out and reach

24  to other individuals, young adults, about what life is when you

25  go a different route and this is what can happen to you.

1    And I wasn't surprised by those things because it's always

2  been in him to be that type of person, to reach out and touch

3  other people.  Sometimes life grabs people and you make

4  mistakes.  But I can't say that I think he changed to be a

5  better person just because of being shot.  I think it was like

6  a wake-up call because it was already there.  And it was there

7  to be poured out.

8    And I tell him all the time that God left you here for a

9  reason, and that reason is to reach other people.  And mistakes

10 are made so that you can tell people what it's like to make a

11 mistake.  You can't tell somebody how to change your life if

12 you never had to change your life.

13    And so Bradley's always been that person.  But when he

14 started taking the steps to actually pour it out, it made a

15 difference.  And he did it in that condition.  You know, in a

16 wheelchair.  If that's what it took.

17    MS. LAWSON:  Judge, may I have just a second?

18    THE COURT:  You may.

19 BY MS. LAWSON:

20 Q.  Ms. Beamon, can you tell the Court your knowledge of any

21 additional medical hurdles or medical steps that he's needing

22 to take in regards to the injuries he's suffered?

23 A.  Bradley still has a bullet in his back.  So every so often

24 he still would have to go to the doctor to get scanned to make

25 sure that bullet doesn't move, because that bullet can move.

1    And it's there.  They did not remove it.

2        He has bladder problems.  He was supposed to have surgery

3    on his bladder so that he can be able to know when he needs to

4    go to the bathroom and things like that.

5        Then in the wheelchair sometimes, because of not having

6    movement, his feet will slump so he needs his therapy to do

7    that.  And not to say that no one else can do it, but at the

8    same time to do it properly, we spent a lot of time with the

9    Fayette County Jail when he first went.  My number is probably

10   on their log a thousand times because of his being taken care

11   of.

12       The way he needs to sleep, infections, bed sores and

13   things like that, he's going to forever need care.  But there's

14   certain things that at this time they were more important.  We

15   worry about that bullet.  We worry about if an altercation

16   takes place and he can't move as fast as somebody on their

17   feet.  You know, that bullet shifts and then we're paralyzed

18   not just from the waist down, it could be in other places.

19       So the care of his bladder.  The bullet.  His legs, he's

20   supposed to have braces on his legs.  All of those were things

21   that were to take place, but because of the situation have not.

22   So I know they didn't go away just because of this situation.

23   They just haven't been able to be done.

24       MS. LAWSON:  Okay.  Judge, that's all I have.

25       THE COURT:  Thank you.

1    Mr. West.

2    MR. WEST:  Yes, ma'am, thank you.

3                    CROSS-EXAMINATION

4  BY MR. WEST:

5  Q.    I just have a few questions for you.  Bradley actually

6  lives in Louisville, correct?

7  A.    Correct.

8  Q.    Now, does he have a vehicle that's equipped with hand

9  controls that he can drive?

10  A.    He doesn't have a vehicle at all.

11  Q.    He doesn't have a vehicle at all?

12  A.    No.

13  Q.    But he has doctors' appointments here in Lexington,

14  correct?

15  A.    Yes.  Well, the one specialist, the doctor that looked at

16  him when he first got shot, he came back here so that that

17  doctor could do some follow-up.  But 99 percent of his

18  appointments are in Louisville.

19  Q.    How does he get from Lexington -- from Louisville to

20  Lexington?

21  A.    He has a mother with a car, he has cousins with a car, he

22  has siblings with a car.  He has kids.  He has a daughter that

23  her mother has a car.  So other individuals would transport him

24  back and forth.

25  Q.    You mentioned his children.  They live here in Lexington?

1    A.    One does.

2    Q.    One does.  Does the mother of that child live in Lexington

3    also?

4    A.    Yes, she does.

5    Q.    Is he financially responsible for taking care of that

6    child, to the extent that he can be financially responsible?

7    A.    Do you mean child support wise?

8    Q.    Yes, ma'am, I do.

9    A.    He is not on child support with that child.  But he does

10   everything that he could for her when she asks, that's my

11   understanding.

12   Q.    Okay.  Does he visit her here in Lexington also?

13   A.    Yes.

14   Q.    Now, you don't have firsthand knowledge of the

15   transactions that are the substance of why Mr. White is here,

16   do you?  In other words, you weren't present when those

17   transactions --

18   A.    No.

19   Q.    You weren't involved in any of the text messages back and

20   forth or anything like that, correct?

21   A.    I wasn't involved but I've read a lot of stuff.

22   Q.    I'm sure that you did.  Now, he was released from the

23   hospital on rehab about when?

24   A.    Maybe -- maybe September or October.

25   Q.    Okay.  Do you know the first -- the date of the first

1   transaction involved in this indictment, ma'am?

2   A.   I do not.

3   Q.   Okay.  So November 16th, 2017.

4   A.   Okay.

5   Q.   So this is after he was released, this conduct takes

6   place, correct?

7   A.   Okay.

8   Q.   You know the substances that were involved?

9   A.   Yeah.  From the report, I do.

10  Q.   Okay.  What do you understand from the report?

11       MS. LAWSON:  Judge, I'm going to object if he's asking her

12  to interpret reports and discovery that she's --

13       THE COURT:  Rules of evidence are not really applicable

14  here and he's just asking general questions, so I understand

15  she's not an expert in this area.

16       MR. WEST:  True.

17  A.   My understanding was it was heroin.

18  BY MR. WEST:

19  Q.   How about fentanyl also, do you know that?

20  A.   I don't know what fentanyl is, but I seen that word.  I

21  did.

22  Q.   And just for purposes of the Court, Byron White, is that

23  your cousin also?

24  A.   Yes, it is.

25  Q.   So you're cousins to both of them?

1  A.   Yes.

2  Q.   But they are not blood brothers, correct?

3  A.   They're not blood brothers, but they are blood cousins.

4  Q.   You got that right.

5       Thank you, ma'am.  That's all.

6       MR. WEST:  Thank you, Judge.

7       THE COURT:  Any redirect?

8       MS. LAWSON:  None, Your Honor.

9       THE COURT:  Thank you, ma'am.

10      MS. LAWSON:  Judge, I have one other quick witness.

11      THE COURT:  You may.

12      MS. LAWSON:  Jacqueline Hollingsworth.

13      **JACQUELINE HOLLINGSWORTH, DEFENSE WITNESS, SWORN**

14      THE COURT:  You may proceed, Ms. Lawson.

15      MS. LAWSON:  Thank you, Your Honor.

16                    JACQUELINE HOLLINGSWORTH

17                       DIRECT EXAMINATION

18  BY MS. LAWSON:

19  Q.   Would you please state your name for the record?

20  A.   I will.  It's Jacqueline Hollingsworth.

21  Q.   And how are you currently employed?

22  A.   I'm currently retired, disabled.

23  Q.   Okay.  So what did you do prior to your retirement?

24  A.   I was a police officer for Louisville Metro Police.  And I

25  worked in drug prevention, violence prevention, gang prevention

1    programs for young people.

2    Q.    How long did you do that?

3    A.    I did drug prevention for 14 years and I also worked

4    undercover for narcotics.

5    Q.    What do you do now in your retirement?

6    A.    Now I go into different public schools, community centers.

7    I have a prison program that's called From The Inside Out.  And

8    I take people into Jefferson County Public Schools and

9    parochial schools and we do programs, outreach trying to keep

10   kids from landing in prison, behind Kentucky prison walls or

11   getting killed on the streets in Kentucky.

12   Q.    Do you know Bradley White?

13   A.    I do.

14   Q.    How do you know Bradley?

15   A.    In 2016, I had an initiative through President Obama's

16   program called Brother's Keeper.  And one of the goals was to

17   try and reach African-American young men and get them on the

18   right path.

19        And I sent out a proposal into the community looking for

20   people to come and speak to young people.  And for the whole

21   year of 2016, I solely went into the schools by myself because

22   I had no people that would step up to the podium.

23        2017, I was contacted by a young man, actually four

24   different young men that were paralyzed in wheelchairs.  They

25   were wanting to go into the schools with me and accommodate me

1   to tell the kids about their struggles of living behind the

2   life of a wheelchair from gunshot wounds and being paraplegic

3   and evolving from a life of crime.  Bradley White was one of

4   the young men that contacted me.

5       Him, alongside another young man that ran parallel sports

6   programs at schools, played school teams, and it was a big

7   challenge for me, because I was down trying to get two

8   wheelchairs of two young men that are totally paralyzed into

9   the back of my car, and started going into the schools and

10  community centers and wherever we could and telling their

11  stories.

12  Q.   So how long did Bradley do this with you?

13  A.   From my understanding, when I met Bradley he had already

14  received his gunshot wounds.  We started going out around

15  September of 2017.  How I know, because the only way that I

16  could give them funding was I run Christmas programs for kids.

17  I had no money for our initiatives, our president was replaced

18  and the program from Washington received no funding.

19      So I had promised him the only thing I could do for him

20  was just hope that, in time, we would have some kind of money

21  to pay him.  So Christmas 2017, I provided Christmas for his

22  children.  He had five children.  And that's how I know the

23  date so well, because he was one of the biggest families that

24  we were able to help.

25  Q.   So he was doing this with you for a period of time.  How

1    many schools would he go to during that time?

2    A.    If I had to say, we went from elementary, middle and high

3    schools.  We targeted behavioral schools, kids that were

4    definitely high risk.  It wasn't the amount of schools, per se,

5    that we were going to, it was the amount of kids that we were

6    reaching.

7         Because of his condition and the other young man's

8    condition in wheelchairs, he's not able to stay for long

9    periods of time because they were only allowed to sit for so

10   long without having to replace colostomy bags, urine bags.  So

11   we couldn't go as often.

12        Bradley, if you know him, he suffers from -- some days he

13   can't get up, his legs, if he's having a bad day.  Or say if

14   they take their medicine at a certain time, so we kind of

15   fluctuated up and down to how many times that we could go.  Or

16   the condition of my vehicle, whether I was able to place the

17   number of wheelchairs in my car.  But we extensively hit the

18   pavement from -- we could make this September 2017 all the way

19   up until his incarceration.

20   Q.    And can you give an estimate to us about how many children

21   Bradley spoke to during that time?

22   A.    Per school, some occasions we may have anywhere from like

23   50, to a minimum, I think sometimes, maybe like 15.  Depending

24   on how many kids, and like I said, the target audience that the

25   school preferred.

1       But I think our largest group that we were able to speak

2    to was through the Men Equality Program, which contains a lot

3    of young black males through Jefferson County Public Schools,

4    it would range anywhere from about 150 to 200 kids.

5    Q.    Thank you.

6          MS. LAWSON:   That's all I have, Your Honor.

7          THE COURT:   Thank you.

8          Mr. West.

9                        CROSS-EXAMINATION

10   BY MR. WEST:

11   Q.    Ms. Hollingsworth, I just have a few questions for you.

12   You said Bradley White contacted you in October of 2017?

13   A.    That's correct.

14   Q.    And then he started going into the schools in

15   December 2017?

16   A.    No, before December.

17   Q.    Okay.

18   A.    We started immediately.  I think the first contact that I

19   received from him, we went that next week.

20   Q.    So you would hope that these young men that you worked

21   with are not engaged in drug trafficking activities while they

22   are working with you?

23   A.    Absolutely.

24   Q.    Have you had a chance to review the plea agreement of

25   Bradley White?

1   A.    I have.

2   Q.    Did you read the first paragraph? I'll just kind of

3   paraphrase it. Between on or about November 1st, 2017, and

4   March 18, 2018, the defendant, being Bradley White, engaged in

5   an agreement with Byron White to distribute controlled

6   substances in Lexington, in the Eastern District of Kentucky.

7   The defendant, Byron White, did distribute controlled

8   substances at a specified location in Lexington on these

9   occasions. Bradley White had contact with a cooperating

10   witness and discussed price, quantity and the distribution

11   location.

12   A.    Yes.

13   Q.    Did you read that?

14   A.    Yes, I did.

15   Q.    So while he was going into these schools, he was engaging

16   in this agreement with his cousin; is that accurate?

17   A.    I'm going to say speculation. I find it hard to believe

18   being on the premise that when I would contact Bradley White

19   myself, I've had so many messages back and forth with me and

20   Bradley White, or times that he was picked up by me and my

21   vehicle, that I couldn't understand how anybody that was

22   surveilling did not see him going into the schools.

23   Q.    Okay.

24   A.    Nor me engaging -- or even pulling me over because he was

25   in my car numerous times.

1    Q.    Okay.   Those locations you're talking about are in

2    Louisville, correct?

3    A.    That's correct.

4    Q.    They are not in Lexington, correct?

5    A.    No, that's correct.

6    Q.    Then you understand the transactions actually took place

7    in Lexington, correct?

8    A.    Correct.

9    Q.    Do you have --

10   A.    The alleged -- the ones that were alleged.

11   Q.    I'm going to refer to Document Number 46, which is part of

12   the court record, which is signed by Bradley White and myself

13   and his attorney acknowledging these facts are true.

14        So you have no direct knowledge of what took place in

15   Lexington, do you, ma'am?

16   A.    No, I do not.

17        MR. WEST:  That's all.  Thank you, Your Honor.

18        THE COURT:  Any redirect?

19        MS. LAWSON:  Nothing, Your Honor.

20        THE COURT:  Thank you very much.  Thank you for the work

21   you do.

22        THE WITNESS:  All right.  Thank you.

23        THE COURT:  Ms. Lawson.

24        MS. LAWSON:  Judge, those are all the witnesses I intend

25   to call this morning.

1          THE COURT:  All right.  Thank you.

2          MR. WEST:  Your Honor, at the Court's convenience, I can

3      argue the position of the United States and the probation

4      officer when the Court is ready to hear from me.

5          THE COURT:  You may, then I'll let Ms. Lawson respond.

6          MR. WEST:  Yes, ma'am.

7          The role adjustment in this case is primarily dealing with

8      the leadership role.  If the leadership role is applied, then

9      the argument on the minor role really doesn't apply.

10         THE COURT:  We're talking about 3B1.1(c)?

11         MR. WEST:  Yes, ma'am.

12         THE COURT:  The two points.

13         MR. WEST:  It's a two-level enhancement, yes.  But that

14     aggravating role on the 3B1.1(c) does not deal just with

15     leadership.  It says "If the defendant was an organizer,

16     leader, manager, or supervisor in any criminal activity," then

17     the two-level enhancement appropriate.

18         When you go to the commentary, there are two sections that

19     actually deal with this matter, being Application Note 2, it

20     says, "To qualify for an adjustment under this section, the

21     defendant must have been the organizer, leader, manager, or

22     supervisor of one or more participants."

23         Application Note Number 4 says, in distinguishing a

24     leadership and organizational role from one of a mere

25     management or supervisor, the words "kingpin" and "boss" are

1  not controlling.  Factors the Court should consider include the

2  exercise of decision-making authority, setting price, quantity

3  and location.  The nature of participation in the commission of

4  the offense.

5      The only person contacted between the cooperating witness

6  was Bradley White and her.

7      The recruitment of accomplices.  How Byron White got there

8  is not a mystery and it's not a large stretch of logic.  The

9  only way Byron White got there to make the distribution was

10  with the organizational activities of Bradley White.

11      The degree of participation and planning or organizing the

12  offense.  There is but one person, defendant, who planned or

13  organized this offense, and that is Bradley White.

14      And the degree of control and exercise over the others.

15  Now, in this manager instance, the defendant, Bradley White,

16  could be considered a leader.  I think that's not as strong as

17  the situation being a supervisor or manager or organizer.

18  Because there was no testimony, there was no evidence

19  whatsoever, other than what Detective Alcala talked about was

20  the contact between the cooperating witness, was only with

21  Bradley White on all four of these occasions.

22      United States submits that a two-level enhancement is

23  appropriate.  The comments and the responses by the United

24  States probation officer are also appropriate, that he was the

25  manager, he was a supervisor.  He's not deserving of a minor

1  role.  Thank you, Your Honor.

2       THE COURT:  All right.

3       Let's just talk about the leadership role at this point,

4  Ms. Lawson.

5       MS. LAWSON:  Certainly, Your Honor.  Section 3B1.1(c),

6  Note 4 states the factors that the Court should consider in

7  determining the decision-making authority and the nature of the

8  participation in the commission of the offense, which includes:

9  the recruitment of accomplices, the claimed right to a larger

10  share of the fruits of the crime, the degree of participation

11  in planning or organizing the offense, the nature and scope of

12  the illegal activity, and the degree of control and authority

13  exercised over others.

14       Judge, in questioning the investigator, it is very clear

15  there has been an assumption made that these text messages, and

16  what's included in these text messages between Bradley and the

17  confidential informant, that coupled with the statement that

18  has been made by the codefendant, makes Bradley a leader.

19       As indicated in the cross-examination, there was no steps

20  made to determine actually where the narcotics came from prior

21  to any statement from Byron White.  There was no steps taken to

22  determine communication between Byron White and Bradley White

23  prior to all of this.  I don't quite understand how the

24  controlled buys wouldn't lead to some type of probable cause to

25  have looked into that.

1    All of this is simply based on the statement of a

2 cooperating codefendant.  It is very likely, especially

3 considering that Byron White was located in Lexington, living

4 in Lexington, was dictating where these controlled buys would

5 come.  And, again, that Bradley White was acting solely as a

6 facilitator between those two.  Bradley White was the

7 connection between the confidential informant and Byron White,

8 who was, in fact, dictating where these controlled buys were to

9 happen, how much was to be brought, what the price was.  And

10 all the evidence shows is that Byron White showed up at these

11 controlled buys with the narcotics.  In fact, I think the

12 evidence shows that he apologized for the shortage that the

13 officer testified to, and took the money that was provided to

14 the controlled -- to the confidential informant.

15    That's all that the evidence shows.  Anything else is

16 simply based on a statement of a cooperating codefendant.

17    And therefore, Your Honor, we do not think they met their

18 burden to show that he had this leadership role in regards to

19 this activity.

20    THE COURT:  As noted in the background notes in 3B1.1, in

21 a relatively small criminal enterprise that's not extensive, we

22 look at the distinction between organization and leadership and

23 that of management or supervision in a less significant way.

24    We also look -- the reason there is the lower point

25 allocation to 3B1.1(c) is because there aren't as many people

1   involved and the level of the management or supervision isn't

2   as stratified.

3       But what we do see is, in looking at Notes 2 and 4, is

4   that participation and planning or organizing the offense, the

5   nature of the activity, and the degree of control exercised

6   over others or the property would allow someone to qualify

7   under this subsection.

8       And here what we see -- I'm going to discount anything

9   that Byron White says.  Taking out everything that Byron White

10  says, if you look at paragraphs 5 through 9 or 10, what we see

11  is a cooperating witness contacts Bradley White.  The

12  cooperating witness says I want to buy dope.  How much?  A

13  quantity is set.

14      Bradley arranges, negotiates the price and tells the

15  cooperating witness where to go to pick up the dope.  This is

16  all arranged without any conversation with Byron White.  He

17  doesn't say, "let me call you back later and see where my

18  source is."  He says, "you go here and you go get the dope."

19  The cooperating witness shows up and the dope is present.  The

20  deal is done through Mr. Byron White admittedly, but arranged,

21  the time and place was organized and controlled by Bradley

22  White.

23      So the Court believes that the probation officer's

24  response is correct.  I've heard the testimony here in court.

25  Again, assuming a cooperating codefendant, I'm going to

1  discount what he says because I think there's ample evidence to

2  show by a preponderance of the evidence that 3B1.1(c) applies

3  here because Mr. Bradley White exercised management

4  responsibility over the process, access and activities of this

5  relatively small criminal organization.

6      I will take some of this into consideration as I look at

7  the 3553(a) factors.  So the objection is overruled.

8      Let's move next to the objection regarding the career

9  offender status.

10     Do you want to address that in further detail, Ms. Lawson?

11     MS. LAWSON:  Judge, in the interest of efficiency, I have

12  briefed that pretty significantly in my sentencing memo.

13     THE COURT:  I have it.

14     MS. LAWSON:  Unless Your Honor has questions, we'll stand

15  on the arguments made.

16     THE COURT:  All right.  And I read your brief, it's a very

17  nice brief, Ms. Lawson.

18     Mr. West.

19     MR. WEST:  Your Honor, I don't have any further comment.

20  I believe the response of the United States Probation Office is

21  accurate.  Unfortunately, in this situation the prior felony

22  offenses are what they are.  They can't be changed at this

23  point and he does qualify as a career offender.

24     THE COURT:  Yes.  I am going to rely on the analysis by

25  the United States Probation Office.  The career offender

1   application is correctly made in the presentence report by the

2   probation office.

3        Are there any other objections, Ms. Lawson?

4        MS. LAWSON:  We made an objection in regards to the lack

5   of a two-level reduction for a minor role.  But I think your

6   finding with the leadership makes that point moot, quite

7   frankly, Your Honor.

8        So outside of that, no other objections.

9        THE COURT:  I'll note your objection for the record and

10  note that it's rendered moot by my finding on the leadership

11  role.

12       Mr. West, are there any other issues for the United States

13  along the calculation of the guidelines?

14       MR. WEST:  No, Your Honor.

15       THE COURT:  Very well.

16       The Court will adopt the factual findings and advisory

17  guidelines that are set forth in the presentence report.

18       After having heard the objections and the evidence

19  presented in court, the Court determines that the appropriate

20  advisory guideline range for this defendant is from 188 to 235

21  months, based on a total offense of 34 and a criminal history

22  category VI.

23       The Court notes that the First Step Act has been applied

24  and that this is a significant reduction from the original 262

25  to 327 month calculation.

1    Are there motions from the United States?

2    MR. WEST:  Your Honor, the defendant having pled guilty to

3    Count 1, we would move to dismiss the remaining counts as they

4    apply to him.

5    THE COURT:  All counts will be dismissed.

6    The Court has read the defendant's sentencing memorandum

7    and motion for a downward departure.  The Court has considered

8    all of the materials submitted in this case, which are quite

9    substantial.

10   And, Mr. White, I'm going to hear the lawyers' kind of

11   final arguments here in just a second, but is there anything

12   that you would like to say to the Court to help it in

13   determining your sentence here today?

14   THE DEFENDANT:  Yes, ma'am.  I wrote a letter.  It says,

15   while being locked up, it has given me a lot of time to think

16   and reflect on my life and actions.  I know I have a long

17   criminal history, but this is actually the longest time I've

18   been behind -- I spent behind bars.  It has really humbled me

19   and made me realize a lot about myself and my past actions in

20   life.  It has made me look at a lot of things differently.

21   I want to start out by acknowledging and accepting my

22   wrongdoing.  I truly never knew how bad the opioid crisis was

23   until my incarceration, seeing other people in there going

24   through withdrawal and hearing their stories about how it

25   ruined their lives.  It really made my heart heavy and made me

take a good look in the mirror.  How could I be a part of destroying my communities and other's lives?

I take full responsibility for my actions.  And I want to apologize for my wrongdoing.  I can accept any punishment that is given to me for my wrongdoing.

At the time I was going through a lot.  On May 12th, 2017, two friends of mine and I were gunned down by a man who one of my friends had a dispute with the man's girlfriend.  As a result, I lost two good friends that I've known since middle school and my ability to walk in one night.  In the blink of an eye, my whole life had changed.  I am a father of five kids, three boys and two girls, who I cherish so much and who I love more than life itself.

It hurt me so much knowing that some of the things we loved doing, I wasn't going to be able to do with them anymore after being shot and paralyzed from the waist down.  It threw me into a downward spiral.  I didn't know how I was going to support my family anymore.

I was always in constant pain.  I was diagnosed with PTSD, anxiety and depression.  I was suicidal and at one point made an attempt to kill myself.  I was put on so many different medications it was hard to keep track.  I couldn't work.  I had no money.  I had lost everything, even the will to live.

And with the holidays came even more depression.  Having kids that I couldn't provide for broke me as a man.  I've

1    always been able to do for my family but this time I couldn't.

2    I was lost and confused.  I was approached with a situation

3    that I knew wasn't a good one, but I did anyway.  I take full

4    responsibility for my part and my actions.  I never should have

5    did what I did.  I accept my wrongdoing.  I would never go down

6    the path of any unlawful doing if given the chance to.

7         I have kids that look up to me, that I love dearly -- that

8    love me dearly, and I love wholeheartedly, a community that I

9    owe for my wrongdoing.  A family that needs me.  I am sorry and

10   I accept my fate, whatever it may be.

11        THE COURT:  Thank you very much, Mr. White.

12        Ms. Lawson.

13        MS. LAWSON:  Judge, I don't want to belabor anything that

14   I have already filed and has been reviewed by the Court.  And

15   we've heard a lot about medical issues that he's now suffering

16   from, which is more than, quite frankly, many of my clients

17   that I deal with have ever suffered through before.

18        But this is probably the first time, Your Honor, in the

19   federal realm that I've realized, quite frankly, the travesty

20   that our state court can do to some of our young individuals.

21        We have a man that has very clearly indicated that this is

22   not his first time in the criminal system, but it is definitely

23   his first time in the federal system and learning what seems to

24   be good deals, easy ways out in the state court have major

25   ramifications in the federal realm.

1    In reviewing his record, this is the most time that he has

2    ever spent locked up.  He is well aware that he's looking at a

3    significant amount of time but, Your Honor, we would submit to

4    you that the guideline range is more than what is necessary to

5    teach him his lessons in this front.  15 years is a lot of time

6    when you haven't spent more than 90 days in a state prison.

7    He's already had a lot of time to think about it.  He knows he

8    will have a lot of time to think about it.

9    But we are asking the Court to vary from that guideline

10   range to give him a lower sentence that can fulfill the factors

11   of 3553 in deterring future criminal contact of Mr. White.  He

12   is young, but I do see a change, that he is ready for a change.

13   I think a medical facility is an obvious for him.  I think

14   that there are things that need to be followed up on in regards

15   to his injuries.

16   But certainly vocational and educational training that he

17   can receive while incarcerated will help put him on the right

18   path when he is released to be a law-abiding citizen that is

19   employed and providing for the family that he has.

20   Thank you, Your Honor.

21   THE COURT:  Thank you.

22   Mr. West.

23   MR. WEST:  Yes, Your Honor.  Not unmindful at all of

24   Bradley White's physical condition, the reality is that's not

25   going to change.  I'm very impressed by the White family who

1    has shown up every single time that both Bradley and Byron have

2    been to the courthouse, that is unusual, to say the least, in

3    federal court, that families show up.  So he has strong family

4    support.

5         Yet despite the horrific injury he suffered, he engaged in

6    the same conduct that he was involved in before but even to a

7    greater degree.  Ms. Hollingsworth who testified, who runs a

8    program underfunded and underappreciated, thought she could

9    trust him.

10        But yet while he was in these middle schools and high

11   schools talking to these kids about the dangers of what

12   happens, he's engaging in the conspiracy to distribute heroin

13   and fentanyl.

14        As this Court's aware, this community -- I'm not talking

15   just about Lexington, but I'm talking about Central Kentucky

16   and Eastern Kentucky -- are gripped with heroin and fentanyl

17   distribution.  And it is killing people.  The death toll from

18   drug overdoses is listed primarily with fentanyl and heroin in

19   the last few years.  It's outrageous.

20        And these quantities that were involved in this case, they

21   aren't simple gram quantities of heroin or user quantities of

22   half ounces and ounces.  Even one of those transactions, it was

23   over 40 grams of fentanyl.  Just breaking that down, that's

24   80 dosage units for an addict to use.

25        You would think, and as human beings we would think with

1 such a horrific event happening, this person would completely

2 change their livelihood.  But yet what we find in this

3 situation is Mr. Bradley White, despite his physical condition

4 and limitations, engaged in conduct that was a step above what

5 he had been charged with beforehand.

6 Very simply put, even the horrible situation that happened

7 to him did not stop him from selling drugs.  It didn't.

8 As a practical matter, I'll ask the Court to designate him

9 to a medical facility for an evaluation.  I think that's what

10 we're allowed to do.  You can't make a specific designation for

11 an evaluation.  To the extent that could be done here in

12 Lexington, we do not object.  There is a circumstance with

13 Mr. Morgan, that they probably should not be in the same

14 facility.

15 However, despite the defendant's physical condition, the

16 United States argues that the public, the community in

17 Lexington and other places, need to be protected from

18 Mr. Bradley White.  I would ask the Court to impose a sentence

19 within the guideline range of 188 to 235 months.  I would ask

20 the Court to go to the very bottom end of 188 months, please.

21 Thank you.

22 THE COURT:  You know, it's very clear that, unlike so many

23 people who come before this Court, Mr. White is well loved and

24 supported by his family members.  Most people don't have that,

25 Mr. White.

1    From what I've read in this presentence report, your mom

2    has worked hard to support your family and meet your family's

3    needs, and people like Ms. Beamon are here to take care of you

4    and to help you.

5    And probably more than most anybody that sits on the

6    federal bench, I am particularly sympathetic to the trauma

7    that's experienced by this defendant.  I understand more than

8    most the challenges of caring for somebody who is confined to a

9    wheelchair and the complicated life of one who is confined to a

10   wheelchair.  My heart goes out to you and your family because

11   of your injury and your condition.

12   And while I understand and am so sorry for what you have

13   endured, it is difficult to understand why, after all you've

14   been through and all these people helping you, there was

15   nothing about your condition that prevented you from selling

16   heroin and for arranging it to be sold, for working with

17   another person to sell it.  There's no evidence in this record

18   that suggests that your physical condition or mental condition

19   prevented you from understanding the wrongfulness of your

20   actions or from being capable of planning and participating in

21   these actions.

22   Ms. Lawson made a good point about our state court system.

23   Your criminal history is serious.  It's a criminal history

24   category VI, that's the highest category.  I think that it's

25   well intended but maybe misguided, in that if you had served

1  four or five years when you got in trouble earlier, you might

2  not be looking at 15 now.  And sometimes I think that, you

3  know, judges have tried to show you mercy.  They've tried to

4  help you straighten up.  You've taken deals to kind of get it

5  behind you and move on.  And now, when you have committed a

6  serious crime, your past has serious consequences.  But it does

7  suggest that you have not learned from your prior mistakes.

8  And I believe you when you said you have had more time to

9  reflect on the wrongfulness of your actions while sitting in

10  jail.

11      So really what this comes down to is formulating a

12  punishment that reflects the seriousness of the offense and

13  protects the public from this kind of behavior.  And believe

14  me, as you know, the public is suffering because of this kind

15  of behavior.

16      I do believe, however, because of your age, that this

17  Court is willing to consider a downward variance from the

18  guidelines.  And I wasn't really prepared to do this because I

19  thought you've already gotten a huge break.  I mean, you have

20  already received a huge break through the First Step Act.  But

21  I do believe in this case that this Court can combine a longer

22  period of supervised release that would justify a slight

23  downward variance in order to reflect the seriousness of this

24  offense and to afford just punishment.

25      Therefore, it is the judgment of this Court that the

1    defendant is hereby committed to the custody of the Bureau of

2    Prisons to be imprisoned for a term of 160 months.

3        It's recommended to the Bureau of Prisons that you

4    participate in job skills and vocational training.  That you be

5    assessed with a medical evaluation at the Bureau of Prisons.

6    It's recommended that you participate in a mental health

7    program and that you participate in the Residential Drug Abuse

8    Treatment program.

9        This is a serious sentence.  Although I have varied, I

10   recognize it is still a very long one.  I have varied, again,

11   but I believe that a term of supervised release of eight years

12   will justify this variance and protect the public with the

13   protection that it needs.  Therefore, you will be on supervised

14   release for eight years when you are released from prison.

15       Now, within 72 hours of your release from prison, you must

16   report in person to the probation office in the district to

17   which you are released.

18       While you're on supervised release, you must not commit

19   another federal, state or local crime, and you must comply with

20   the mandatory and special conditions that are set forth in the

21   judgment and commitment order.

22       You must not possess a firearm, dangerous weapon or a

23   dangerous device.

24       You must refrain from the unlawful use of controlled

25   substances.

1    You must comply with the special conditions that have been

2  adopted by this Court, in that you must abstain from the use of

3  alcohol.

4    You must not purchase, use, distribute or administer any

5  controlled substance or paraphernalia related to controlled

6  substances except as prescribed by a physician.

7    And you must not frequent places where controlled

8  substances are illegally sold, used, distributed or

9  administered.

10    If you owe any money to the government, you've got to keep

11  your finances available to the probation officer.

12    You must submit your person, property, house, residence,

13  vehicles, papers, computers and other electronic and

14  information storage devices to a search conducted by the United

15  States Probation Office.  And that also, I think, helps me

16  justify the variance in this case.  You must warn other

17  occupants of the premises that it could be subject to search.

18  And if you don't allow the search, that could be grounds for

19  revocation of your release.

20    You must not obstruct or attempt to obstruct or tamper in

21  any way with any drug testing mechanisms that are required.

22  And you must submit to periodic drug and alcohol testing at the

23  direction and discretion of the United States Probation Office.

24    Now, based on your current financial situation, the Court

25  waives a fine.  I don't think you have the money to pay it.

1      But you must pay a special assessment of $100, and that's

2 due immediately.  Is that correct, is that $100 right?

3      PROBATION:  I'm sorry, Your Honor?

4      THE COURT:  Is the hundred dollars correct, Mr. Hammond?

5      PROBATION:  Yes, that's correct.

6      THE COURT:  Okay.  All right.  Thank you.  I just wanted

7 to be sure.

8      Is there any legal reason sentence should not be imposed

9 as stated, Mr. West?

10      MR. WEST:  No, Your Honor.

11      THE COURT:  Ms. Lawson, other than those you've already

12 raised?

13      MS. LAWSON:  None, Your Honor.

14      THE COURT:  Thank you very much.

15      Mr. White, I want you to listen carefully, the clerk of

16 the court is going to give you some information.  It has to do

17 with your rights of appeal, and I know Ms. Lawson's keeping you

18 well advised.

19      Nevertheless, she's going to read this to you, she's going

20 to give you a copy to keep for your records.  I'll ask you and

21 your lawyer to sign a copy and give it back to the Court for

22 its records.  Please listen carefully.

23      THE CLERK:  Criminal defendants have the right to appeal

24 their case to the Sixth Circuit Court of Appeals, which on

25 proper appeal will review the case and determine whether there

1   has been an error of law.

2        However, defendants may waive those rights as part of a

3   plea agreement.  You have entered into a plea agreement in

4   which you waived your right to appeal the guilty plea,

5   conviction and sentence, but reserved the right to appeal any

6   determination that you are a career offender.

7        Such waivers are generally enforceable, but if you believe

8   the waiver is unenforceable, you can present that theory to the

9   appellate court.

10       If you do not have sufficient funds to pay for the appeal,

11  you have a right to apply for leave to appeal in forma

12  pauperis, which means you may appeal without paying for it.

13       If you are without the services of an attorney and desire

14  to appeal, upon request the clerk of the court shall prepare

15  and file a notice of appeal on your behalf.

16       This notice of appeal must be filed within 14 days from

17  the date of entry of the written judgment.

18       If you do not have sufficient funds to employ an attorney,

19  you may request appointment of counsel to prosecute the appeal

20  for you.

21       THE COURT:  The record will reflect that the defendant

22  and his counsel have executed the acknowledgment form.

23       Is there anything further from the United States?

24       MR. WEST:  No, Your Honor.  Thank you.

25       THE COURT:  Anything further for the defense?

1       MS. LAWSON:  No, Your Honor.  Thank you.

2       THE COURT:  Thank you all very much.  That concludes this

3  hearing.  Parties and counsel may be excused.  We will proceed

4  on to the next matter.

5       (Proceedings concluded at 10:16 a.m.)

6

7                    C E R T I F I C A T E

8

9       I, Linda S. Mullen, RDR, CRR, do hereby certify that

10  the foregoing is a correct transcript from the record of

11  proceedings in this above-entitled matter.

12

13  /s/Linda S. Mullen              November 27, 2019
    Linda S. Mullen, RDR, CRR       Date of Certification
14  Official Court Reporter

15                    I N D E X

16  WITNESS                                    PAGE

17  HECTOR ALCALA PASCUALLI
    Direct Examination By Mr. West              6
18  Cross-Examination By Ms. Lawson            11
    Redirect Examination By Mr. West           16
19
    DONYALE BEAMON
20  Direct Examination By Ms. Lawson           17
    Cross-Examination By Mr. West              23
21
    JACQUELINE HOLLINGSWORTH
22  Direct Examination By Ms. Lawson           26
    Cross-Examination By Mr. West              30

23

24

25